May it please the Court, I'm Judith Wood and I'm representing Mr. Etemadi in his motion to reopen for relief under the Convention Against Torture. The issue in this case is the commitment of the United States to the international human rights law as described in the Convention Against Torture. We cannot send someone back to a country where it is likely that he will be tortured upon his return. Etemadi is a Christian who converted from Islam to Christianity while in the United States. Although we have no control over that. Ms. Wood, what's your best argument or authority that we can revisit Mr. Etemadi's CAC claim considering the fact that the Ninth Circuit denied relief, I think it was 2007, and did not agree with his CAC claim then? Well, the best argument is that the judge conflated the rationale behind his decision in denying asylum and relief under the Convention Against Torture. This Honorable Court, in the decision of Camus, said that the court cannot conflate the reasons for denying asylum with that of denying Convention Against Torture, and went on to explain that when there's a pattern of persecution against a particular group in a certain country, that that has to be taken into account and requires relief under the Convention Against Torture. In Kamaltas, the issue was whether a Tamil person who had been persecuted in Sri Lanka on account of his political and ethnic position... And so Kamaltas wasn't in effect at the time that the first panel, our 2007 panel, reviewed this case? I believe it was in effect, Your Honor. However, it seems that it wasn't sufficiently argued. The country conditions in Iran have continued to reflect ongoing persecution of Christians, especially Christians who have converted, who face apostasy, the charge of apostasy, and possibly death. In the documents which I submitted to the court, it's clearly documented that Iran persists in persecuting Christians and severely persecutes those who convert from Islam to Christianity because the government of Iran considers that a threat to the political themes that are current in Iran, as you know, religion and... But how do you address, though, our law that says that we're supposed to look at the changed country conditions? And I agree with you that this makes it very difficult for your client that we're supposed to look at the changed country conditions from the 2002 when the war broke out to 2018, and that's the period that we're supposed to be looking at to see if there's been any material change in country conditions. Well, as to material change, it's gone on and repeated itself over and over again. It's increasing severity. It's almost impossible to exactly calculate the severity and the level of increased severity that has existed in Iran from the time of 2002 to the present time. But we have submitted documents showing that this is ongoing and increasing. Let me just change the subject just a little bit from what my colleague had raised. My understanding is that the initial panel denied cat relief because it simply didn't believe that your client had converted to Christianity. And since that's its conclusion, how would changed country conditions in Iran ever allow him to reopen his case? Well, the reason why the court found that they didn't believe him was because the immigration judge didn't believe him. And the immigration judge found that it was very self-serving that he had converted from Islam to Christianity. But there's no evidence in the record, is there, that the IJ would just flat-out wrong? Well, the IJ did not believe, basically, that he had become a Christian because he was convinced because of the nature of the frivolous aspect of the case that he had submitted. We believe that he had – we admit that he had submitted false documents. He was the victim of people who were practicing immigration law and submitted – But are we not bound, though, by the earlier determination under the law of the case that he found he was not a Christian? He found that was phony. He had false documents and so on. Whatever his counsel did, there was no claim of ineffective assistance of counsel that I'm aware of. But the fact is, I don't see how you get relief based upon the fact that the previous panel concluded that your petitioner was not a Christian convert and therefore country conditions wouldn't make any difference in any event. How do you deal with that? How can an immigration judge set himself up as a judge as to whether someone's a Christian or not? Well, that's what they do all the time. They get to make credibility determinations, as you very well know as an experienced lawyer. And particularly now under the REAL ID Act, demeanor, the fact that he submitted a lot of false documents, that all plays into it. But that's what he does. Or she does. Whatever the case may be. And that's what happened. He didn't really conduct an analysis of the religion, Your Honor. He was simply saying that because I found you frivolous, I don't believe you in your conversion argument. Well, he didn't know the name of the church. He didn't know where he was going. It was along with the fabricated documents, it seemed like your client was just making it up. And that's what the IJ concluded. He actually, Mr. Etemadi testified as to the nature of his belief, the nature of his conversion, and that he actually was a teacher in the school, in the Christian school. He was a Sunday school teacher and continues to this day to go to that church. Well, by the end of the day, you and I seem to disagree on what an IJ can do. But in this the IJ determined that your client was not a Christian convert. The BIA confirmed that. And here we are all these years later. I don't know why we're not bound by that determination. And if that's true, what difference would it make even if there were changed country conditions? Well, obviously, the pivotal aspect of this case is whether or not he is a Christian. And therefore, I believe that the case should be remanded so that he can actually develop that before. Do you have any case law that would permit us to remand on that basis where the IJ and the BIA concluded he was not a Christian convert all these years ago? You're asking that you're saying basically, they got it wrong. We want you to send it back. What case would you rely upon that would permit us to do that? I'm basically relying on the Convention Against Torture itself, Your Honor, which prohibits the United States from sending someone back to a country where it is more likely that they will be tortured. But on that point, counsel, are you really saying that you don't even need changed country conditions? We just start de novo. I mean, it seems to me there's no law for that. I thought that your argument was that you changed country conditions would allow you to reopen, and the reopening would then allow you to at least relitigate. Did the IJ get it wrong because he didn't look at the documents because he said things that were wrong? Then you would attack that under the Convention Against Torture. I thought you had a process. But you can't just say out of the sky now, do you? The Convention Against Torture means you get to start over. Well, Your Honor, I believe that the main point in this case is that the immigration judge did not give a full analysis under the Convention Against Torture, but merely decided that this person wasn't really a Christian on account of the fact that he had submitted false documentation, which he had actually admitted to during the course of the trial. He had submitted false documentation with respect to other things. Exactly. That is, he didn't find, as I read it, that he had submitted anything false with respect to his religion was the way I read it. Is that fair? Right. He submitted a document regarding baptism and a letter from his pastor, and he himself is a teacher. And I think that the judge just absolutely classically, this is a classic case where the judge conflated his rationale and his reasoning between his finding of frivolousness and not believing the conversion. Do you want to save any of your time for rebuttal? You've only got about 30 seconds left. Yes. Up to you. Yes, I do. Okay. All right. Balance your time. Ms. Henley, on the phone, you want to respond for the Attorney General, please? May it please the court, Madeline Henley for the Attorney General. The board acted well within its broad discretion when it denied petitioner's motion to reopen his cat claim based on an alleged deterioration and treatment of Christian converts in Iran. This is so for two reasons. First, the board reasonably denied reopening because petitioner failed to attach any application for relief to his motion as the regulations require. Second, the board reasonably concluded that even assuming petitioner is a Christian convert, he failed to show a material change in country conditions for Christian converts in Iran between 2002, when he was last before the immigration judge, and 2018, when he filed this motion to reopen. I'd like to briefly address the board's decision based on the regulations. No. Sorry. Ms. Henley, can I ask you a question? Sure. Let's focus on that last argument that you made. I'm just curious, because you argue that the country conditions report that Mr. Etemadi has submitted is not indication that Christian converts in Iran were worse in 2018 than it was in 2002. I just find that curious, because it sounds like if the IJ had gotten to the point of reviewing the documentation that Mr. Etemadi submitted back in 2002, the reports seem to indicate that Christian converts are in danger of being tortured or killed. Do you dispute that? We don't dispute that the evidence that petitioner submitted with his original asylum application in 1997, and then with the amendment three years later, that that evidence shows that Christian converts were considered to be apostates, and that apostasy could be punishable by death. The argument is that in order to prevail in seeking reopening of his tax claim... But let me just, so you agree with that. So what evidence could he submit to you now to say that the situation is worse? What's worse than death or torture based on his, you know, Christian beliefs? I just find this to be an interesting position now for the petitioner, or for anybody, based on what the government is arguing, that somehow folks who are Christian converts, how can they ever prove that the situation is worse than death and torture? Well, I mean, I'm just speculating as to what evidence might be out there, but it seems possible that, for example, what was known, if you compare the 2000 report, for example, the State Department report on international freedom that was submitted with the original application with the 2016 State Department report, submitted with the motion to reopen, there's an indication that conditions have improved. So even though it was true that apostasy could be punishable by death, whether or not the Iranian authorities are actually charging anyone, or sentencing anyone, or carrying out the sentences, that can vary over time, and indeed it seems to have, and it seems to, if anything, have improved, not worsened. Counsel, isn't he making the opposite argument that whatever the legality from the mullahs, there's more suppression of the underground churches, the above ground churches have been completely suppressed, and they're now suppressing underground churches so that there's more likelihood of actually coming to their attention? I thought that was pretty much his best argument as to why things were in fact changed. Well, I think you're referring to the second of the two reports that was submitted, which was the Austrian Red Cross report, which focused on house churches. Yeah. And that, first of all, that report, my recollection is that report spoke about changes just in the last few years, and so one point I any of the evidence where it's characterized as having been recent, say 2016-2017 changes, what's required for reopening is that there be a showing by petitioner that the conditions have worsened, and to do that there has to have been evidence that you can compare from the past, or from the whole time span between 2002 and 2018, as this court recently reaffirmed in Murizi. The record has to contain evidence to compare the conditions from the time that the case was before the immigration judge and the motion to reopen. And if I could just speak to the house churches. Counsel, you do have the 2002 reports, and we can read the two together, but that raises for me the question of how much of a showing does he have to make at this point? Does he, do we have to determine that the conditions have definitively changed, or does he only have to make a colorable showing and then let the let the board, the IJ and the BIA examine it in more detail? That is, does he have to make enough to convince us 100 percent, or does he have to make enough to raise the showing? He would have to show that the board's conclusion that there hasn't been a worsening was unreasonable or arbitrary, or that not supported by substantial evidence in the record. And I would just point out that in the 1998 publication of the Iranian Christians International that Petitioner submitted with his original application, it speaks to house churches, and it says that after the murder of a bishop in 1994, government officials began then to focus on ordinary Christians who are Muslim converts, or who encourage Muslims to convert to Christianity. At this point, the small home groups and house churches became endangered when government agents planted informers in these groups, and it also reports that since 1997, government authorities are concentrating on destroying and closing down underground home churches. So that was happening in 1997. It's happening now. I don't think, you know, also his claim, his torture claim isn't about house churches, right, it's that he's going to be... Well, if he is a Christian and, you know, seeks to practice in any way, if there's no above ground and there are suppressing the below ground, he's certainly in that danger, is he not? I mean, I understand the argument about no worsening, and you would just have to weigh, you know, the degree of suppression in these different reports. You're right about that. Right, you have to find that the board was irrational in its weighing, but also to your point about... The only argument they gave, Councilman, on my right, is just sort of the end of the next to the last paragraph. It just says he hasn't determined that they've worsened, just compare this document with that document. I mean, we have the same documents that we can read and see if we disagree. Well, the evidence that petitioner pointed to in the motion to reopen and in the opening brief was evidence of continuing conditions. And in addition, you asked about ability to attend a house church. His claim isn't for persecution or inability to attend religious services, right? This is a torture claim, so he has to show that it's a much more severe harm. Don't we, aren't you, government argues that we are bound by the law of the case in this situation. It seems like we're getting away from what the IJ and the BIA originally found, that he was not genuinely a Christian. To what degree are we bound by that determination here in these years later? You are completely bound by the previous panel decision from 1997 that found that his claim of Christian conversion was false. The court said it was precisely the falsity of this claim. And there's been no, there's no reason why the panel decision wouldn't be binding here. But moreover, you have the statutory prohibition. This petition for review is timely and there's jurisdiction over only the board's denial of reopening, not over any previous decision. Let me ask you about that, because it seems to me that Mr. Etemadi may never have had his IJ in 2002. I understand, even though we have case law that indicates that an IJ should not allow an adverse credibility finding on unrelated issues to a cat claim to wash over the petitioner's cat claim. That's Kamala. I think that's how you say it. Yeah, but and then we've had a case since then of Guan that further, that state that goes even further and state that the adverse credibility determination on an asylum claim for, and here it was for political reasons, shouldn't affect the credibility or spill over to the credibility determination on the cat claim unless, and the IJ is obligated to review the documents that were submitted. And here, there's no record evidence that indicates that the IJ looked at all of the documents. And in fact, the one document that he did look at, he was wrong. And so that seems to have affected the panel decision here, because it seems like there is legitimate documentary evidence supporting Mr. Etemadi's Christian conversion claim that seems to be entirely ignored by the IJ. And that has put Mr. Etemadi in this very previously would have likely given him at least serious consideration for cat relief. Don't you agree that the prior country reports would have given him serious consideration for cat relief? Or do you dispute that? I dispute it, because he wouldn't have been considered. I mean, that's it. That's only if you disregard it, if you disregard the fact that he was peddling. Just bear with me, okay? And I understand that you dispute a lot here, but if you could just bear with me, and if he had gotten to the point where the IJ had looked at the documentary and had come out in a different way, would his documentation on country conditions, which said that apostasy results in a crime punishable by death, would that not have supported his cat claim? The documentation would have been documentary evidence in support of his cat claim if the IJ had been convinced he was a Christian convert. And I just want to point out that I believe the previous panel grappled with what you are grappling with, because it specifically distinguished Camalthus. I understand what you're saying, but you said there's no way that we, based on Judge Smith's question, there's no way we get back to unwind this. But I think there are, or I'd like to hear your thoughts on whether or not, you know, Guam is sufficient intervening authority, and also whether or not just the case law that we have on manifest injustice, based on the fact that Guam, and what the IJ did, is completely counter to Guam. Your Honor, I'm not specifically familiar with Guam, or Juan, I'm not sure what you're saying, but so I can't speak to that, but to the extent that it's a continuation of Camalthus and a requirement that the country conditions be considered to see whether or not, independent of an adverse credibility decision, the country conditions evidence can independently establish relief, here that couldn't have happened, because based on the immigration judge's analysis of Edamati's testimony about his conversion, in addition, the general finding that all of his testimony was incredible, found that the claim of Christian conversion was not true, and this court distinguished Camalthus and agreed that the claim of Christian conversion was false. And he had lots of documents that were false, and he found that, I think the IJ found basically that it was a frivolous application, and basically the whole thing was false. Is that not correct? The whole thing not relating to the Christian, specifically, I believe that the falsity had to do with, right, yes, and then they also found that the Christian concept was false. He couldn't even indicate the denomination to which he belonged. That is correct, and then he got the benefit of the doubt on the precise issue which the court, which the board and the court previously found was false, his Christian conversion, and the board assumed it is true for the purpose of analyzing its motion. It could have conceivably gone a different route and just said no evidence would be, you can show would be material, because we still don't believe that you've established your credibility. With his new evidence with regard to his conversion and made no effort to rehabilitate his credibility. But you're right that the BIA just took his affidavit as true. Is that right, where he says he's a Christian convert? Correct, and it didn't question any of the other representations in there which are also contradicted by his testimony. So the question is, do we really have to go back? I guess one question is, do we really have to go back? Which you say we can't go back, do we really have to go back if the BIA took his affidavit as true? Correct. It took it as true, but then the question is, did he establish the change between 2002 and 2010, the worsening? Right, which you just, I thought, agreed that the evidence that he put in before would have established that apostasy results in death in Iraq. But what we're talking about here is a motion to reopen from decades later, and what the BIA did, if I understand it correctly, is just for purposes of argument say, we have no new evidence about whether he's converted to Christianity, but let's just assume he did. They didn't say he did, they didn't find him credible, they just said, assuming he is, arguendo, he still hasn't shown a difference in terms of what his treatment would be compared to before, and that's the end of the story. Is that correct, counsel? That is correct. But that brings me back to my first question, I think. What's worse than death? What can he show that's worse than death? That it was that way before. Right, I mean, he only has one recourse for the reopening of his motion to reopen, right? The cat claim is implemented through the Attorney General's regulations, and this court said in Govey-Holder that these regulations apply to the reopening of a cat claim, and that he has to follow the requirements that a changed country condition compare treatment between the time of the original hearing and the motion to reopen, and demonstrate that it's worse, and he has not done that. Okay, thank you, and I appreciate your questions. I just, I really needed to ask, because I'm not sure that the current posture that he is in, what recourse he had left. So let me ask you, we're way over time, but let me ask you this, counsel. My colleague has cited a number of more, at least one more recent case. Do we judge what the IJ and the VI did over almost two decades ago by the current law? Are those cases retroactive? No. Well, the question is whether or not it's intervened in the majority, I think, isn't it, Ms. Henley? Well, that is a separate question. If you're looking for a way to circumvent deferring to the prior panel, a change in law would be a reason to revisit the 2007 decision. Well, and I'm not looking to circumvent a prior panel. I just, there's, I'm trying to look at all the law that applies here, and it just, it seems to me that Guam seems to be very relevant to this situation. Well, I would also point out that petitioner did not seek reconsideration, and the board didn't argue that there was intervening law. The board then said, even assuming that you were seeking reconsideration, we're denying it, and it's untimely, way, way untimely, and would deny sua sponte reopening, and then in the opening brief, neither the denial of reconsideration nor the denial of sua sponte reopening was discussed, or any new law. Do either of my colleagues have any additional questions of Ms. Henley? No, thank you. Thank you. In conclusion, respondent respectfully asked that the court uphold the board's decision and deny the petition for review. Okay, Ms. Wood, we let your colleague go over quite a bit, so we're going to give you a couple of minutes to respond if you'd like. Thank you very much. In the International Religious Freedom Report for 2016, which was submitted with the motion to reopen, it is noted that the penal code of Iran specifies the death apostasy. But that was true back in 1997, been true ever since the Ayatollah Khomeini took over, right? Well, it is my argument that is it a cruel and heartless assumption that this court cannot grant relief, because the amount of increase of this mistreatment, in this case death, has not been calculated. Nowhere in the Convention Against Torture is this mentioned or required. The United States has stood for religious freedom since the beginning of our existence, and that is in large part why people first came here. To deny religious freedom to this individual, Etemadi, and to sentence him to a life of torture, and possibly death in Iran, is contrary to our core values. Once again, Etemadi has never committed a crime. There is no bar to relief under the Convention Against Torture in this case. He has never been convicted, and he has never committed a crime. The only problem is that he became prey to these people who first prepared his case. He is an innocent man, and should not be condemned to death in Iran. He was here generically, illegally, as I understand it, and I ask that because the Ninth Circuit decision was in 2007. So what's happened in the intervening time? Has he just been under the radar and all of a sudden decided to move for reopening? I mean, what's different? Was he just got you as a good lawyer? Also, he's become more devout, and he would not hide his religion in Iran. He would not hide his religion. Well, I guess we could have asked the government why didn't they uncover him recently, or did he come to the authorities' attention and then hire you, or did he just decide to move to reopen willy-nilly? Well, he decided to reopen. He is the son, the brother, and the husband of U.S. citizens. He has no one in Iran. There's no one he can go to for protection, and his entire life is here, and if he goes to Iran, he'll be killed. But that doesn't answer my colleague's question about why he didn't act after 2007, seeking to reopen. Well, I didn't know him then, Your Honor, so I don't know. No, not you. I'm talking about your client. I believe that he was afraid and perhaps ignorant of his ability to reopen. Why did he move to reopen? Because he's terribly afraid of being killed in Iran. That's basically the reason. If he had been sent back in 2007, would he not have been afraid of the same thing? Of course, but his fear has increased, and he is now represented by counselors, trying to defend him against his eventual death in Iran if he's removed. Bear in mind, Your Honor, he's never been convicted of a crime. There is no bar to this relief of Convention Against Torture. As you know, there are some restrictions on Convention Against Torture. None of them apply to this individual. The case has ever been heard. Let me ask my colleague whether I have any additional questions for Ms. Wood. No, I'm good. Thank you. All right. Thanks to both counsel for your argument in this troubling case. The case just argued is submitted. Thank you very much, Your Honors. Thank you. Thank you.
judges: Boggs, M. Smith, Murguia